IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE R. HARMON,                  )        CASE NO. 1:13-cv-01446
                                     )
                Plaintiff,           )        MAGISTRATE JUDGE
                                     )        KATHLEEN B. BURKE
        v.                           )
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY ADMINISTRATION,             )
                                     )        **MEMORANDUM OPINION & ORDER**
                Defendant.           )


        Plaintiff Michelle R. Harmon ("Plaintiff" or "Harmon") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 16.   As discussed herein, the Administrative

Law Judge ("ALJ") failed to follow the treating physician rule in that he did not discuss, or even

mention, the treatment records and opinions of two of Harmon's treating doctors when

evaluating her back pain and headaches.  As a result, this Court cannot conduct a meaningful

review of the Commissioner's decision and is unable to conclude that the Commissioner's

decision is supported by substantial evidence.  Accordingly, the Court **REVERSES** and

**REMANDS** the Commissioner's decision for further proceedings consistent with this

Memorandum Opinion and Order.

## I.  Procedural History

Harmon filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 9, 2010.[1]  Tr. 12, 87, 96, 105-106, 107, 119, 131-132. She alleged a disability onset date of September 2, 2010 (Tr. 87, 96, 107, 119, 195, 199) and claimed disability due to heart problems, leg problems, a stroke, depression, and sciatic nerve problems (Tr. 87, 96, 107, 119, 133, 137, 146, 152, 156, 320-322).  After initial denial by the state agency (Tr. 133-139), and denial upon reconsideration (Tr. 146-158), Harmon requested a hearing (Tr. 159-160).  On January 25, 2012, Administrative Law Judge John Dowling ("ALJ") conducted an administrative hearing.  Tr. 27-86.

In his February 6, 2012, decision (Tr. 9-26), the ALJ determined that Harmon had not been under a disability from September 2, 2010, through the date of the decision.  Tr. 12, 22. Harmon requested review of the ALJ's decision by the Appeals Council.  Tr. 8.  On May 1, 2013, the Appeals Council denied Harmon's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational and vocational evidence

Harmon was born in 1969.  Tr. 33, 195, 199.   She was 42 years old at the time of the hearing.  Tr. 33.  She has four children.  Tr. 33.  Harmon had been living with her parents but in July 2011 she moved into her own apartment.[2]  Tr. 33-34.  She was living alone.  Tr. 34. Harmon lost her driver's license in 2004 and has been unable to pay the reinstatement fees.  Tr.

---

[1] The record also shows an application filing date of September 14, 2010.  Tr. 195, 199.  However, the ALJ found that the applications were filed on September 9, 2010, which date is supported by the record and not disputed by Plaintiff.  Doc. 17, p. 2.

[2] Harmon indicated that her apartment was in a HUD apartment building.  Tr. 34.

34.  She uses public transportation, a medical transport service, or receives rides from a friend or family member.  Tr. 34-35.  Harmon finished school through 10th grade and obtained her GED.[3]  Tr. 35.  She briefly attended North Central State College for mechanical engineering.  Tr. 35.  She only completed one semester.  Tr. 35.

In 2010, Harmon worked one or two days each month as a bartender.  Tr. 36.  If someone called off, she would fill in.  Tr. 36-37.  In 2004, Harmon worked for a few years at Liberty Nursing Center in Mansfield as an STNA.  Tr. 38-39, 275.  In 2001, Harmon worked at a company called Romanoff Electric of Columbus where she was learning to wire outlets and fuse boxes.  Tr. 37-38.  She worked at Romanoff for about a year but she did not advance beyond the training period.  Tr. 38.  In 1997 or 1998, Harmon worked as a forklift operator for about a year.[4]  Tr. 39-40.  Over the years, she also worked other labor jobs on a part-time basis.  Tr. 39-40.

**B.    Medical evidence[5]**

**1.  Back issues**

Harmon was seen on March 25, 2011, and again on March 29, 2011, at the emergency department of MedCentral Health System – Mansfield Hospital, with complaints of back pain.  Tr. 719-720, 723-724.  A lumbar spine x-ray was taken during the March 29, 2011, emergency room visit which showed mild lumbar spondylosis and moderate L5-S1 disc disease.  Tr. 722.  On April 1, 2011, Harmon saw Dr. Vijeth Sringeri with continued complaints of back pain, indicating that she had been having back pain for 2 months.  Tr. 746.  Harmon described the pain as stabbing, piercing and shooting in her lower back.  Tr. 746.  The pain was associated with

---

[3] While in middle school, Harmon attended special education math classes.  Tr. 35.

[4] To perform the forklift operator position, Harmon was required to take the tow motor driver's license test but she was not required to obtain a commercial CDL license.  Tr. 41.

[5] Harmon's arguments relate primarily to her back pain and headaches.  Thus, although Harmon received medical treatment for various impairments, the medical evidence section is focused on those impairments.

back stiffness but the pain did not radiate and there were no precipitating factors.  Tr. 746.

However, her symptoms were aggravated by prolonged sitting.  Tr. 746.  There were no relieving

factors.  Tr. 746.  On exam, Harmon's bulk and contour, tone, strength, and coordination were

normal.  Tr. 748.  However, it was noted that the strength and tone testing was limited due to

pain.  Tr. 748.  Dr. Sringeri referred Harmon to Dr. Michael Viau.  Tr. 748.

Harmon saw Dr. Viau on May 9, 2011.  Tr. 726, 727.  Following that visit, Dr. Viau

advised Dr. Sringeri that he had seen Harmon and that "[m]ost activities seem to be aggravating

including, sitting, lying, bending, lifting and walking."  Tr. 727.  He noted that she had limited

improvement with Tylenol and Flexeril.  Tr. 727.  Dr. Viau reported that, on examination,

Harmon had "increased pain with lumbar flexion.  No objective motor sensory reflex asymmetry

noted.  X-rays show a degenerative 5, 1 disc with fairly significant disc space collapse, otherwise

x-rays are unremarkable."  Tr. 727.  Dr. Viau's impression was pain secondary to degenerative

disc disease with a recommendation for a Medrol dose pack followed by Mobic and follow up in

a couple weeks.  Tr. 727.

Throughout 2011, Dr. Viau continued to treat Harmon for her back issues.  Tr. 725-726.

In May 2011, Dr. Viau recommended physical therapy.  Tr. 726.  While physical therapy was

attempted, in July 2011, after one visit, the physical therapist discontinued physical therapy

finding Harmon not fit for physical therapy secondary to increased pain with all positions.  Tr.

683, 726.  In light of the results from physical therapy, in July 2011, Dr. Viau recommended an

MRI.  Tr. 726.  As of September 12, 2011, Dr. Viau noted that Harmon had not yet been

approved for an MRI.  Tr. 726.  He noted that Harmon continued to have low back pain with

radiation into the left lower extremity usually to the knee with straight leg raise reproducing back

pain but not really causing radicular pain.  Tr. 726.  Harmon's lumbar flexion was extremely

limited and her extension was restricted and painful.  Tr. 726.  Dr. Viau discussed options with Harmon and, since conservative treatment had been ineffective, Dr. Viau recommended that Harmon try an epidural steroid injection, which she agreed to undergo during the September 12, 2011, visit.  Tr. 726.

On September 21, 2011, Harmon saw Dr. Viau again.  Tr. 725.  He noted that he was still recommending a follow up MRI subject to authorization.  Tr. 725.  He provided Harmon with a home exercise booklet but was not sure how successful the exercises would be due to the pain that she was having.  Tr. 725.  He noted that Harmon's symptoms and physical exam findings were unchanged.  Tr. 725.  Dr. Viau provided more Mobic and Vicodin for severe pain and noted that the Ultram had been of little help.  Tr. 725.  He noted that "all ADL, standing, walking, sitting are all substantially aggravating."  Tr. 725.

As of October 19, 2011, the MRI had still not been authorized because of an insufficient amount of physical therapy visits.  Tr. 725.  Dr. Viau indicated that physical therapy would be rescheduled but limited it to aqua therapy to see if Harmon could better tolerate it.  Tr. 725.  Following authorization for the MRI (Tr. 725), the October 27, 2011, lumbar spine MRI showed "[m]ultiple levels of degenerative disc change, most prominent at L5-S1."  Tr. 674.  There was no displacement of nerve roots or impingement upon the neural foramen.  Tr. 674.  On December 5, 2011, Dr. Viau reviewed the MRI results noting that they showed degenerative disc disease with her lower discs most severely affected.  Tr. 725.  Dr. Viau discussed options with Harmon, including trying physical therapy again and continuing her on Mobic and Flexeril.  Tr. 725.  He indicated that he would see Harmon again in a month.  Tr. 725.

### 2.      Headaches

On April 12, 2011, Harmon saw Dr. Sringeri complaining of a headache and also complaining of left facial pain for which she had previously received treatment at the emergency room.[6]  Tr. 742.   On May 23, 2011, Harmon complained to Dr. Viau that, since she been on Mobic, she had had terrific migraines. Tr. 726.   A day later, on May 24, 2011, Harmon saw Dr. Sringeri and also complained of headaches located in her left temporal area with pain radiating towards the left area of her neck.  Tr. 735.  Harmon's symptoms included numbness, tingling and weakness but no nausea, vomiting, photophobia, phonophobia, aura or scotoma.  Tr. 735.  She described her pain as sharp and aching with her headaches occurring daily.  Tr. 735.  Some parastesia was noted at the V Trigeminal Maxillary – Left.  Tr. 736.  Dr. Sringeri prescribed Floricet, a CAT Scan of the head/brain, and instructed Harmon to follow up if she did not improve or if her symptoms worsened.  Tr. 737.  On June 6, 2011, Harmon was seen at the emergency room with complaints of left-sided numbness.  Tr. 685-690.  She also complained of a headache.  Tr. 685.  The impression from her emergency room visit was transient ischemic attack, resolved and hypercoagulable state.  Tr. 690.  She was advised to follow the instructions given by the Coumadin Clinic.  Tr. 690.  On June 16, 2011, Harmon saw Dr. Sringeri following her hospital visit.  Tr. 731.  Harmon was feeling well with minor complaints.  Tr. 731.  Her headaches and numbness on the left side of her face had improved.  Tr. 731.

---

[6] On January 30, 2011, Harmon had presented to the emergency department of MedCentral Health System – Mansfield Hospital, complaining that she was unable to speak and had numbness of her left side.  Tr. 446-454.  She was admitted to the hospital and discharged on February 1, 2011, with diagnoses of transient ischemic attack, hypercoagulable state, hyperlipidemia, and being on chronic Coumadin therapy (due to a history of pulmonary embolus as well as a history of ASD repair and previous stroke).  Tr. 446.

Dr. Raymond Baddour, M.D., saw Harmon for a neurological evaluation[7] and, on October 19, 2011, Dr. Baddour wrote to Dr. Sringeri explaining his impression and plan.  Tr. 754-755, 757.  Dr. Baddour indicated that, since January 2011, Harmon had been having headaches and left-sided calvarial burning pain, numbness and tingling as well as left-sided facial numbness and occasional tingling in the maxillary region.  Tr. 755.  Harmon's headaches were occurring daily and, at times, were constant.  Tr. 755.  Dr. Baddour indicated that the etiology of Harmon's symptoms was unclear.  Tr.  755.  He also indicated that Harmon's headaches suggested the presence of a migraine component but noted that that the character of her headaches raised concern for a possible concurrent tension headache component and/or left-sided occipital neuralgia.  Tr. 755.  Dr. Baddour concluded that Harmon's headaches were frequent and severe enough to warrant prophylactic therapy.  Tr. 755.  He started Harmon on a course of medication, including amitriptyline, and indicated that Harmon would be evaluated further with a head MRI and EEG.  Tr. 755, 757.  He also indicated he wanted to see Harmon again in 2 months for reassessment. Tr. 757.

On January 3, 2012, Harmon saw Dr. Baddour for follow up.  Tr. 752-753.  Dr. Baddour indicated that Harmon's November 7, 2011, brain MRI was normal (Tr. 752-753, 756) and her January 3, 2012, EEG was essentially unremarkable (Tr. 752-753).  The severity and frequency of Harmon's pain had reduced since the initiation of amitriptyline and Harmon had had only one day of severe pain in the prior week.  Tr. 753.  He also noted that the Tranxene that Harmon had been taking for her headaches and calvarial sensory symptoms had been of some benefit.  Tr.

---

[7]  Dr. Sringeri had referred Harmon to Dr. Baddour in April 2011.  Tr. 744. Also, during Harmon's January 31, 2011, emergency room admission, Dr. Baddour saw Harmon for a consultation of a possible cerebrovascular accident.  Tr. 455-457.  Dr. Baddour was not convinced that Harmon had another cerebrovascular ischemic event and noted that concern was raised that her symptoms may be psychogenic in etiology.  Tr. 456.  However, he noted that Harmon did have risk factors for cerebrovascular disease, including a prior history of stroke in August 2010, suspected hypercoagulable state with a prior history of bilateral lower extremity deep vein thrombosis and pulmonary embolism.  Tr. 456-457.

753.  He increased her amitriptyline and continued other medications.  Tr. 753.  He indicated that he wanted to see Harmon again in 4 months for reassessment.  Tr. 753.

**C.     Testimonial evidence**

**1.     Harmon's testimony**

Harmon was represented and testified at the administrative hearing.  Tr. 33-68.  She provided testimony regarding her personal, vocational and educational background.  Tr.  33-41. In response to questions regarding why she is unable to work, Harmon explained that, in 2010, she had a heart attack and stroke when she was in Kentucky.  Tr. 41-42.  She underwent heart surgery to repair a hole in her heart.  Tr. 42.  Both before and after her heart attack she had problems with fatigue.  Tr. 42.  When she returned to Mansfield, she was seen by medical providers at Mid-Ohio Heart and complained of blood clots.  Tr. 43.  A CT scan showed multiple blood clots in her lungs for which she was hospitalized.  Tr. 43.  After her hospitalization, she continued to have pain.  Tr.  43.  Her doctors indicated that the possibility of scar tissue from her surgery could be the cause of her chest pain.  Tr. 43.   Her doctors also told her that her breathing issues could be related to scar tissue in her lungs but they had not determined what was causing her breathing issues.  Tr. 60-61.  She now takes Coumadin to prevent blood clots and stated that she will be on Coumadin for the rest of her life.  Tr. 61.  She continues to have constant chest pain, mostly on her left side.  Tr. 42.  She described her chest pain as feeling as though someone were sitting on her chest.  Tr.  44.  Her chest always feels heavy.  Tr.  44.  Also, her left arm feels heavy, numb, and is unworkable, i.e., she does not have control with her left arm.  Tr. 44, 53, 61, 62.  Her doctors have said that the numbness in her arm could be the result of her stroke.[8]  Tr.

---

[8] She also indicated that, since her stroke, her whole left leg stays heavy and her left foot stays numb and tingly.  Tr. 63.

62.  She is right-handed and is able to use her right hand and arm without problems. Tr. 53, 61-62.

For about a year, she has had back pain that travels from her lower back down into her left leg.  Tr. 45.  If Harmon sits or stands for too long, it is difficult for her to walk.  Tr. 45.  If she is not out of breath or having chest related symptoms, she can stand about 15-20 minutes and she can sit about 20-25 minutes.[9]  Tr. 51.  Harmon stated that, while at home, she usually lies down most of the day because it is the most comfortable position for her.  Tr. 52.  She also stated that, in order to get through the day, she would have to lie down at least 4 times during the day for about 30-45 minutes.  Tr. 52.  With respect to her ability to lift, she indicated that, if she picks up a gallon of milk, she feels it pull in her back.  Tr. 53.  Medication helps relieve her low back pain but it never goes away.  Tr. 45.  She takes anti-inflammatory medicine.  Tr. 45.  She has a TENS unit for electrical stimulation but it does not really help so she does not use the machine very often.  Tr. 46.  She attempted physical therapy but, after about 45 minutes, the physical therapists stopped the therapy because they believed that it would make Harmon's back worse.  Tr. 46.  Dr. Viau, her orthopedic surgeon, recently recommended aqua therapy but Harmon had not yet tried it.  Tr. 46.  Dr. Viau informed Harmon that an MRI showed that her lower disk was collapsed and two disks higher up were also collapsing.  Tr. 47.  He advised her that the only solution was surgical fusion but she could not have surgery because of blood thinners she takes and her heart condition.  Tr. 45, 47, 62.

She also has anxiety and panic attacks.  Tr. 42.  She indicated that she is very depressed and a wreck all the time.  Tr. 43-44.  She is afraid to go anywhere because she has numbness in her face and head and is afraid that she will have a stroke.  Tr. 44.  She experiences three or four

---

[9] When asked how long she is able to sit, Harmon noted that she was experiencing pain while sitting during the hearing.  Tr. 51.

panic attacks each day.  Tr. 55.   Every time she is out, she has a panic attack.  Tr. 56.  If she is at home, she still has panic attacks but they are not as extreme.  Tr. 56.  When Harmon has a panic attack, it is hard for her to breathe.  Tr. 53.  As examples, she indicated that, if she is in a car or around a lot of people, it is hard for her to breathe.  Tr. 53-54.   She usually has migraines as a result of a panic attacks and she has an "unbalanced feeling."  Tr. 53-54.   To deal with a panic attack, Harmon has to go somewhere quiet and relax so that she can catch her breath.  Tr. 55.

She has migraines every day.  Tr. 47-48.  She had recently started to see neurologist Dr. Baddour for her headaches.  Tr. 50.  Her headaches start in the back of her neck and move towards the front.  Tr. 47-48.  She experiences tingling and numbness.  Tr. 48.  She noted that she has constant numbness in her face, not only when she is having a migraine.  Tr. 48.  Other than taking medicine for her migraines, she has to lie down and rest for about 45-60 minutes.  Tr. 49-50.  After about an hour, her symptoms are not completely gone but she is able to function.  Tr. 50.

Harmon takes care of her own cleaning and cooking.  Tr. 56-57.  In order to get her shopping done, she takes medicine to deal with her anxiety and gets what she needs from the store and gets out.  Tr. 56.  Depending on how her back is feeling or how out of breath she is, sometimes she puts off her chores or takes breaks.  Tr. 57.  During a typical day, Harmon gets up, makes coffee, brushes her teeth, takes her medicine, relaxes by watching movies on the television, and she fixes something for lunch.  Tr. 57-59.  She enjoys doing word search puzzles.  Tr. 65.  She is able to shower herself but, when she is finished showering, she is totally out of breath and has to sit down and relax before being able to comb her hair.  Tr. 60.   She does not exercise because of her breathing issues and because of her back.  Tr.  66.

When Harmon moved into her new apartment, her brother and some friends helped her move.  Tr. 64.  She sees her mom and dad about once a week when she goes to her mom's to do laundry.  Tr. 64.  She has some friends from high school with whom she visits with while at her mom's house or over the phone.  Tr. 64.

### 2.  Vocational Expert's testimony

Vocational Expert ("VE") George Coleman, III, testified at the hearing.  Tr. 68-85.  The VE described Harmon's past work as including work as: (1) a certified nursing assistant in a nursing home, a semi-skilled (SVP 4),[10] medium level job; (2) an electrical helper/assistant, a semi-skilled (SVP 3), medium level job; and (3) a forklift operator, a semi-skilled (SVP 3), medium level job.[11]  Tr. 69-70.

The ALJ asked the VE to consider an individual of the same age, education and work experience as Harmon who was able to perform the exertional demands of light work except she could only occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally stoop, frequently crouch, frequently crawl; must avoid concentrated exposure to extreme cold and heat; must avoid concentrated exposure to unprotected heights and hazardous machinery; and would be capable of work limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decision with few, if any, workplace changes.  Tr. 70.  The VE indicated that the described individual would be unable to perform Harmon's past work because her past work was semi-skilled.  Tr. 71.  However, the VE indicated that there would be other jobs in the regional or

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

[11] Harmon also performed other work, including work as a bartender, factory laborer, warehouse dispatcher, and setup operator.  Tr. 68-70.  However, the ALJ noted during the hearing that the work was for a very short period and/or it did not look like Harmon performed the work at substantial gainful activity levels.  Tr. 68-70.

national economy that the described individual would be able to perform, including (1) laundry aid, an unskilled (SVP 2), light job with 29,160 jobs available statewide and 865,960 available nationwide; (2) a router or routing clerk, an unskilled (SVP 2), light job with 16,200 jobs available statewide and 450,460 available nationwide; and (3) a storage facility rental clerk, an unskilled (SVP 2), light job with 15,730 jobs available statewide and 414,700 nationwide.  Tr. 71-72.

The ALJ then asked the VE to assume an individual as described in the first hypothetical but with the addition of the following limitation – the individual would be capable of performing the exertional demands of sedentary work and the individual would be capable of a job that allows the individual to alternate sitting or standing positions every 30 minutes provided that she remains productive.  Tr. 72.  The VE indicated that there would be other jobs in the regional or national economy that the described individual would be able to perform, including (1) address clerk, an unskilled (SVP 2), sedentary job with 2,680 jobs available statewide and 101,450 available nationwide; (2) charge account clerk, an unskilled (SVP 2), sedentary job with 8,240 jobs available statewide and 204,730 available nationwide; and (3) tube operator (like mail or FedEx distribution), an unskilled (SVP 2) job with 2,490 jobs available statewide and 85,620 available nationwide.  Tr. 72-73.   The ALJ then added to the hypothetical the following limitation – the individual could only have occasional interaction with the public and co-workers.  Tr. 73.  The VE indicated that the address clerk and tube operator positions would remain but the charge account clerk position would not be available because that position would require interaction with and gathering information from the public.  Tr. 73.  However, the VE indicated that the job of cable worker, an unskilled (SVP 2), sedentary job with 20,050 jobs available statewide and 410,750 nationwide, would also be available to the described individual.  Tr. 73.

Following questions from Harmon's counsel, the VE indicated that the sit/stand option could impact the ability of the individual to perform the address clerk job.  Tr. 75-76.  The VE also indicated that, depending on the employer and the setting, the work station for a tube operator might be set up for more of a sedentary working situation.  Tr. 77-78.  The VE indicated that the job numbers provided were based upon occupational employment group numbers, which could include other Dictionary of Occupational Titles ("DOT").  Tr. 78-81.  The VE also indicated that he used job browser software to identify jobs within an occupational employment group.  Tr. 81.  The VE was unable to identify the other jobs within an occupational employment group but indicated that the essential functions of job titles within an occupational employment group would be similar.  Tr. 80, 83.

In response to other questioning, the VE indicated that if, due to a combination of mental and physical impairments, the individual would be off task more than 15% of the workday, there would be no employment available to the individual.  Tr. 73.  The VE also stated that, if an individual was required to lie down three times during the workday for 90 minutes at a time, there would be no competitive employment for that individual.  Tr. 84.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[12] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[14] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[12] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[14] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his February 6, 2012, decision, the ALJ made the following findings:[15]

1.  Harmon met the insured status requirements through December 31, 2013. Tr. 14.

2.  Harmon had not engaged in substantial gainful activity since September 2, 2010, the alleged onset date.  Tr. 14.

3.  Harmon had the following severe impairments: transient ischemic attacks, degenerative disc disease, and borderline intellectual functioning. Tr. 14-15.  Harmon's alleged depression was a non-severe impairment and all other impairments mentioned in the record, but not discussed at Step Two, were found to be non-severe impairments.  Tr. 15.

4.  Harmon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 15-16.

5.  Harmon had the RFC to perform sedentary work, except she would be limited to frequent crouching and crawling; could only occasionally stoop and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could perform work with a sit/stand option to change positions every 30 minutes provided that she remains productive; should avoid concentrated exposure to extreme cold, extreme heat, hazardous machinery, and unprotected heights; she would be limited to work that requires simple, routine, and repetitive tasks with no fast-paced production requirements and that requires only simple work-related decisions with few, if any, workplace changes.  Tr. 16-21.

6.  Harmon was unable to perform any past relevant work.  Tr. 21.

7.  Harmon was born in 1969 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 21.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[15] The ALJ's findings are summarized.

8.    Harmon had at least a high school education and was able to communicate in English.  Tr. 21.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 21.

10.   Considering Harmon's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Harmon could perform, including address clerk, charge account clerk, and tube operator.  Tr. 21-22.

Based on the foregoing, the ALJ determined that Harmon had not been under a disability from September 2, 2010, through the date of the decision.  Tr. 22.

## V. Parties' Arguments

### A.    Plaintiff's arguments

First, Harmon argues that the ALJ violated the treating physician rule by failing to mention her treating physician Dr. Viau, including his opinion that "most activities seem to be aggravating including sitting, lying, bending, lifting and walking."  Doc. 17, pp. 4-5 (referencing Tr. 725-727).  Harmon asserts that Dr. Viau reported that sitting and standing were "substantially aggravating" to Harmon's condition and contends that those opinions are inconsistent with the ALJ's finding that Harmon had the RFC to perform sedentary work with an option to stand after 30 minutes.  Doc. 17, pp. 4-5; Doc. 19, p. 3.

Second, Harmon argues that the ALJ erred with respect to his consideration of the effect of her migraine headaches.  Doc. 17, pp. 6-8; Doc. 19, pp. 3-4.  She argues that the ALJ did not discuss her migraine headaches when discussing her severe impairments and did not include unscheduled work interruptions in the RFC or VE hypothetical to account for headache-related functional limitations, such as the need to lie down or an inability to concentrate.  Doc. 17, pp. 6-8.  Harmon also argues that the ALJ's failure to mention the finding and conclusions of her

treating neurologist Dr. Baddour regarding her headaches constitutes a second failure by the ALJ to follow the treating physician rule. Doc. 17, p. 8; Doc. 19, p. 4.

Third, Harmon raises four instances of error with respect to the VE testimony and/or the ALJ's reliance upon the VE testimony. Doc. 17, pp. 8-14. She argues: (1) because the VE testified that the sit/stand RFC limitation would impact an individual's ability to perform the address clerk position, there is no substantial evidence to support the ALJ's finding that an individual with Harmon's RFC could perform the position of address clerk (Doc. 17, pp. 8-9; Doc. 19, pp. 4-5); (2) there is no evidence as to how many tube operator jobs could be performed by an individual with Harmon's RFC because the VE testified that, depending on the employer and the setting, the sit/stand limitation could also impact an individual's ability to perform the tube operator position (Doc. 17, p. 9; Doc. 19, p. 5); (3) the VE provided erroneous job incidence numbers because the numbers were based on occupational employment groups that included occupations that did not match Harmon's RFC, i.e., there were occupations within the occupational employment groups that were not sedentary and unskilled positions (Doc. 17, pp. 9-12; Doc. 19, pp. 5-7); and (4) the ALJ relied on jobs in occupations that are inconsistent with the DOT's strength and skill ratings, and therefore, the VE should have explained the conflict between his testimony and the DOT.[16] (Doc. 17, pp. 12-13; Doc. 19, pp. 7-8).

## B.    Defendant's arguments

The Commissioner argues that remand is not warranted for consideration of Dr. Viau's opinion that "most activities seem to be aggravating including sitting, lying, bending, lifting and walking" because that opinion was made prior to the completion of testing, including an October

---

[16] As part of her fourth argument with respect to the VE testimony, Harmon argues that, although she raised objections to the VE's testimony, contrary to HALLEX § I-2-5-55, the ALJ did not address her objections. Doc. 17, p. 13; Doc. 19, pp. 7-8. In making her argument, Harmon cites to HALLEX section 1-2-5-55. Doc. 17, p. 13. The correct citation is I-2-5-55.

27, 2011, MRI showing degenerative disc changes but no displacement of nerve roots or

impingement upon the neural foramen. Doc. 18, p. 8 (referencing Tr. 674). The Commissioner

points out that Dr. Viau recommended water aerobics and prescribed medication, not surgery,

and that other physical examinations of record were unremarkable. Doc. 18, p. 8. Further, the

Commissioner argues that, although Harmon has some discomfort, that does not render her

unable to work. Doc. 18, p. 8.

The Commissioner argues that, although the ALJ did not find Harmon's headaches to be

a severe impairment at Step Two, the ALJ found other impairments to be severe impairments and

proceeded past Step Two. Doc. 18, p. 9. Further, the Commissioner argues that the ALJ's

discussion of the evidence, including evidence regarding Harmon's headaches, demonstrates that

her headaches were not a severe impairment. Doc. 18, pp. 9-10.

The Commissioner argues that the ALJ's reliance upon the VE testimony was proper and

that the VE testimony constitutes substantial evidence. Doc. 18, pp. 11-15. She argues that the

VE did not conclude that the hypothetical individual could not work as an address clerk and,

therefore, the ALJ properly relied upon the VE's testimony concerning the occupation of address

clerk. Doc. 18, p. 12. She also argues that the VE's testimony was valid notwithstanding the

fact that he provided job numbers based on occupational groupings and that Harmon is unable to

invalidate the VE's testimony based on post-hearing submissions that included a more specific

breakdown of job incidence data. Doc. 18, pp. 12-13. The Commissioner also argues that

HALLEX § I-2-5-55 relates to objections made to VE testimony during a hearing and, therefore,

Harmon's claim that, pursuant to HALLEX § I-2-5-55, the ALJ was required to discuss

Harmon's post-hearing submissions in his decision is without merit. Doc. 18, p. 14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    Reversal and remand is warranted because the ALJ did not follow the treating physician rule in that he did not consider or evaluate the treatment records and opinions of two of Harmon's treating physicians**

### *Dr. Viau and Harmon's back impairment*

Harmon argues that the ALJ violated the treating physician rule by failing to discuss or even mention Michael R. Viau, M.D., a treating source, including his reports that "[m]ost

activities seem to be aggravating including sitting, lying, bending, lifting and walking" (Tr. 727),

"[o]n exam she [Harmon] has increased pain with lumbar flexion," (Tr. 727) and "all ADL,

standing, walking, sitting are all substantially aggravating." (Tr. 725).  Doc. 17, p. 5.

"An ALJ is bound to adhere to certain governing standards when assessing the medical

evidence in support of a disability claim." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th

Cir. 2014) (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545 (6th Cir.2004)). "Chief

among these is the rule that the ALJ must consider all evidence in the record when making a

determination, including all objective medical evidence, medical signs, and laboratory findings."

*Id. (*citing 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513); *see also*

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) ("[A]n ALJ must consider

all relevant evidence in the case record.").

Additionally, under the treating physician rule, "[a]n ALJ must give the opinion of a

treating source controlling weight if he finds the opinion well-supported by medically acceptable

clinical and laboratory diagnostic techniques and not inconsistent with the other substantial

evidence in the case record."[17]  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.

2004); *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine

what weight should be given to the treating source's opinion and the Commissioner's regulations

also impose a clear duty on an ALJ always to give good reasons in the notice of determination or

decision for the weight given to treating source opinions.[18]  *Cole v. Comm'r of Soc. Sec.*, 661

---

[17] "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical . . . restrictions."  20 C.F.R. 404.1527(a)(2). The Commissioner does not argue that Dr. Viau's statements do not constitute medical opinions.

[18] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the

F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 20007).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'"  *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'"  *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.  *Wilson*, 378 F.3d at 546-547.

The ALJ acknowledged that Harmon made persistent complaints of back pain and discussed Dr. Sringeri's treatment notes as well as a May 2011 lumbar x-ray and an October

---

opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

2011 MRI.  Tr. 19.  Additionally, the ALJ discussed and weighed opinion evidence from state agency reviewing and consultative physicians as well as an opinion from Harmon's chiropractor. Tr. 20.  However, the ALJ did not even mention Dr. Viau.

The Commissioner does not contend that Dr. Viau was not a treating source or that the ALJ discussed Dr. Viau's treatment and/or opinions regarding Harmon's back issues.  Rather, the Commissioner argues that, notwithstanding the ALJ's failure to discuss or mention Dr. Viau in his decision, remand is not warranted because Dr. Viau's statements were made prior to an October 2011 MRI which showed no disabling impairment.  However, Dr. Viau's treatment notes reflect that he ordered the MRI and reviewed those findings, noting that the MRI showed degenerative disc disease with Harmon's lower discs most severely affected.  Tr. 725.

The Commissioner also suggests that, because Dr. Viau did not recommend surgery, the ALJ was not required to consider Dr. Viau's opinions or treatment of Harmon.  Doc. 18, p. 8. However, the Commissioner's argument is speculative and unsupported by the record.  For example, while Dr. Viau's treatment notes do not explicitly reflect that he recommended surgery, his December 5, 2011, treatment notes following the MRI reflect that he discussed options with Harmon (Tr. 725) and, during the hearing, Harmon indicated that Dr. Viau told her she could not have surgery because of her heart and the blood thinners that she was on (Tr. 45).

Finally, the Commissioner argues that other examination findings, including Dr. Baddour's, showed normal findings such as 5/5 strength, a normal gait, and normal bulk, contour, tone and coordination.  Doc. 18, p. 8.  However, as discussed more fully below, the ALJ did not discuss Dr. Baddour or his treatment of Harmon.  Further, while the ALJ discussed some of Dr. Sringeri's findings, which showed that Harmon had full muscle strength and normal

contour, muscle tone and coordination (Tr. 19, Tr. 728-729, 731), those same records also indicate that strength and tone testing was limited due to pain (Tr. 730, 733).

Not only are the Commissioner's arguments unpersuasive and/or not fully supported by the record, they also amount to improper *post hoc rationalization* since the ALJ did not even mention or discuss Dr. Viau. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App. 181, 192 (6th Cir. 20*09) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (19*47)). If, as the Commissioner suggests, the ALJ sufficiently considered the evidence and discounted Dr. Viau's findings and opinions that Harmon had "increased pain with lumbar flexion" (Tr. 727) and that most or all activities were aggravating (Tr. 725, 727) on the basis that they were inconsistent with other evidence of record or unsupported by the record, the ALJ should have explained the weight given or otherwise made clear that he considered the evidence and/or his reasons for rejecting Dr. Viau's opinions in accordance with the treating physician rule.

Because the ALJ failed to discuss or even mention Dr. Viau, the Court is unable to conclude that the ALJ considered all relevant evidence.  Further, the ALJ did not discuss, assign weight to or provide any reason, let alone "a good reason" as to why Dr. Viau's opinion should be given less than controlling weight.  Accordingly, in light of the ALJ's failure to adhere to the agency's procedural rules when considering the evidence, the Court is unable to conclude that there is substantial evidence to support the ALJ's decision.  *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.[19]   Reversal and remand is warranted to ensure compliance with the

---

[19] Harmless error may apply in some treating physician situations. Harmless error will apply only (1) if the opinion is so "patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation."  *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x. 543, 551 (6th Cir. 20*10). Here, however, Defendant does not argue harmless error.

treating physician and to ensure that all relevant evidence has been considered.  On remand, the Commissioner should make clear how Dr. Viau's opinions and treatment records were considered and weighed when assessing the extent of limitations, if any,  resulting from Harmon's back impairment.

### Dr. Baddour and Harmon's headaches

Harmon argues that (1) the ALJ erred by failing to find that her headaches constituted a severe impairment; (2) even if her headaches were not a severe impairment, the ALJ erred by failing to account for the limiting effect of her headaches in the RFC; and (3) the ALJ erred by failing to mention her treating neurologist Dr. Baddour's findings with respect to her headaches. Doc. 17, pp. 6-8; Doc. 19, pp. 3-4.  The Commissioner argues that remand is not warranted because the evidence does not support a finding that Harmon's headaches were severe and, even if they were, the ALJ found other severe impairments at Step Two and proceeded to subsequent steps in the sequential evaluation process.  Doc. 18, pp. 9-11.  The Commissioner does not respond to Harmon's argument that the ALJ improperly failed to mention or discuss Dr. Baddour or his findings with respect to Harmon's headaches.

Dr. Baddour opined that Harmon's headaches were frequent and severe enough to warrant prophylactic therapy (Tr. 755).  Even if, as the Commissioner suggests, the treatment records, including those from Dr. Baddour, also show a reduction in the extent of Harmon's headache related symptoms (Doc. 18, p. 11 (citing Tr. 731 (Dr. Sringeri's notes)), 752 (Dr. Baddour's notes)), Dr. Baddour was a treating source and his treatment of and opinions regarding Harmon's headaches was relevant evidence that should have been considered by the ALJ.  However, since the ALJ did not discuss or even mention Dr. Baddour, it is unclear to the Court that the ALJ considered Dr. Baddour's treatment records and opinions regarding the extent

of Harmon's condition.  Accordingly, in light of the ALJ's failure to adhere to the agency's procedural rules when considering the evidence, the Court is unable to conclude that there is substantial evidence to support the ALJ's decision.  *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.  Further, as discussed above, reversal and remand is warranted for proper consideration of the records and/or opinions from another treating source, Dr. Viau.  Accordingly, on remand, the Commissioner should also make clear how Dr. Baddour's opinions and treatment records were considered and weighed when assessing the extent of limitations, if any, resulting from Harmon's headaches.

**B.     Other issues**

Harmon also argues that, because of various alleged errors with the VE's testimony and/or the ALJ's reliance thereon, the ALJ's Step Five finding is not supported by substantial evidence.  This Opinion does not address Harmon's additional arguments because, on remand, the ALJ's further evaluation of the evidence relating to Drs. Viau and Baddour may impact the ALJ's findings under the remaining steps of the sequential analysis.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the

Commissioner's decision for further proceedings consistent with this Opinion.[20]

Dated:  August 22, 2014

_____

Kathleen B. Burke
United States Magistrate Judge

---

[20] This opinion should not be construed as requiring a determination on remand that Harmon is disabled.